Good morning, your honors. Good morning. I am Mark Newman, and I represent Walt Harvey as the appellant in this matter. I want to talk briefly, and if I can get some clarification from the court, I noticed that the calendar indicated a 20-minute argument, and I believe we had a 15. Okay, thank you, your honor. But if you're really dazzling us, we may give you a little more time. Well, I feel bad if I don't get 20 now. The point that I want to make initially with respect in particular to what I think is probably the most important issue here, which is the treatment of the affidavit of Mr. Countryman as a sham affidavit, is the stark and very important contrast between testimony in the context of the underlying state court action and the testimony or affidavit that clarified that testimony for purposes of a coverage matter before the district court. In the state court action, the only issue that was dealt with or needed to be dealt with or that was necessary for determination in the state court was, in fact, whether or not the debris in its interaction with the dock facility actually caused the sinking, ultimate sinking of the dock. There was no issue whatsoever that needed to be presented necessary to that determination that the damage started within the policy period that was for Scottsdale's coverage relative to Mr. Moreno. It was simply not necessary. But causation is a common element to both, correct? Oh, that's true. We don't dispute that causation is an element to both. In fact, we don't dispute what I believe my colleague has indicated, is that the fact that there was causation between the debris and the sinking was, in fact, determined and has raised judicata or at least collateral estoppel as to the parties involved in this case. So your only point, as I take it, is that in the state court the question of timing was never addressed as distinct from causation. That's correct. It was never addressed, nor did it ever need to be addressed as a necessary determination as long as causation between the debris and the sinking was established. Surely there were dates alleged in the state proceeding, weren't there? Sure. There is testimony with respect to timing of when the debris came in contact with the dock facilities. There was testimony, and it's not disputed by appellant in this case. There was testimony by Mr. Countryman that the critical event and the most, I would say, the most significant event that led to the sinking occurred, in fact, after the policy had lapsed. In October, there's no dispute. Mr. Countryman hasn't attempted to recant his testimony that the actual breach that led to the sinking, the lowering of the river, the dramatic rising of the river, all occurred after the policy had lapsed. But as I think my colleague would likewise agree with, in California, the ultimate damage that occurs does not have to occur during the policy period, so long as damage has occurred or commenced during the policy period. And that was the subject of Mr. Countryman's testimony and his affidavit in support of the motion for summary judgment and in opposition to plaintiffs, I mean to Scottsdale's motion for summary judgment. And on that issue, he simply testified and, frankly, clarified the fact that once the log was in place and restricted movement up and down with the river, understanding that the mechanism of the dock, the dock facility vis-a-vis the pilings, depended upon the free movement of the piling rings up and down to accommodate river-level fluctuations. And in order to do that, once the log was in there and there was restriction to that ability, then he has testified in his affidavit that there was damage being done, first of all, because of the restriction itself and also because of metal fatigue at that time. He did not say that there was a breach within the policy period at that point in time, but the fatigue contributed to the ultimate breach, which is sufficient to trigger coverage. And I will also point out that in addition to Mr. Countryman's testimony, that there was testimony offered on behalf of Mr. Harvey, who also testified that, in fact, the dock mechanism, this mechanism between the pilings and the barge and the piling rings, was compromised and restricted as soon as the logs became wedged. That is independent of the testimony offered by Mr. Countryman. And also, at least, would subvert the motion for summary judgment that was granted in favor of Scottsdale in this case. The issue of Mr. Countryman's testimony is that he has testified, and they've pointed out several pieces of testimony that, frankly, are equivocal. I don't believe that the standard for sham testimony and complete disregard of essentially an unopposed declaration by an expert is appropriate in this case. And I think it's particularly inappropriate because of the differences between the state court action issues and the actions presented here with respect to the coverage issues. And aside from that point, I think that it's inappropriate because they're simply not directly contradictory. I think it is clear from the record that the matters raised by Mr. Countryman in his affidavits are clarifying a very vague testimony that occurred and was not significantly cross-examined for good reason in the state court. What's your view on the broader theoretical question, whether the sham exception should apply to testimony in another case, albeit a related case? Your Honor, I haven't been able to locate anything in the Ninth Circuit. I think the opposition did identify a couple of cases in other circuits that applied a version of the sham affidavit rule to circumstances that were not testimony in the very same case. I think that it's a very dangerous road to go on, and I think this case is a perfect example of why it's dangerous. It's because you can take, as was not the case, by the way, in the cases cited by the appellee in this case, but if you take a situation where the context is different and the approaches and the importance of the issues is different, and then you characterize them as inconsistent with, in a different circumstance related to a completely different issue, which is the timing versus causation itself in this particular case, it I think runs afoul of the cautionary language that appears in almost every case that applies the sham rule. It sounds like your argument, though, if I understood it correctly, is that it almost doesn't matter whether we adopt it as a theoretical principle or not because they're not inconsistent because they were addressing different things. We're making the alternative argument. I don't believe it should apply in this case for either reason. Before you sit down, have the parties made any effort to use the services of our mediation office for the resolution of this appeal? We have not. Okay. Did you want to save a few minutes for rebuttal? I would, Your Honor. Thank you for your argument, and by cutting you at six minutes, I don't mean to underestimate its strength. It's just fine. Counsel? Good morning. Good morning. May it please the Court. My name is Linda Sue, and I represent the plaintiff and appellee in this case, Scottsdale Insurance Company, and I would like to address Mr. Newman's points about the affidavit, which is, in fact, the central issue in this case. First, a point that Mr. Newman appeared to avoid is that we are here on an abuse of discretion standard, and the district court wrote a 13-page opinion that very carefully distinguished between the trial testimony that was elicited from the expert, Mr. Countryman, in the liability action as compared to the two affidavits that he submitted in support of Mr. Harvey's motion for summary judgment, and after carefully considering those two contradictory sets of testimony, reached the conclusion that the affidavits were, in fact, a sham, and we are here on abuse of discretion. The ultimate question, though, of whether summary judgment is appropriate or not is not an abuse of discretion question. If there is an issue of fact, then there isn't summary judgment, and that's a legal issue that we reviewed in Oval. Of course, Your Honor. So if we assume, then, that Harvey has not met his burden of proof on the abuse of discretion standard, and that, in fact, the majority of Mr. Countryman's affidavits are thrown out as a sham, and what we're left with are Mr. Countryman's testimony at trial, which was clear that it was a single point load, which occurred in October of, I believe it was 1998, when the river dropped, and then in November when the river rose, that's what caused the barge to sink, and it's undisputed all of that happened outside the policy period. But isn't it also undisputed that a log became lodged in July during the policy period, and didn't he testify in the state court that that caused at least some constriction in the ability of the dock to move up and down? Yes. And that's undisputed. That is undisputed. That is an accurate rendition of the facts. But it's really an irrelevant fact for purposes of the duty to indemnify, because the whole purpose of Mr. Harvey bringing his lawsuit against Scottsdale's Insured was not because a log wedged in his dock in July. It was because his dock sank because of damage that took place in October and November. But the issues are different when you're looking at insurability. I mean, aren't the issues different in this situation than they were in state court? Your Honor, there can be circumstances where the issues are different, and I suppose Mr. Countryman could have perhaps chosen to testify more vaguely in the trial of the liability action that I'm here to discuss causation. It's my opinion that the dock sank because a log got wedged in there, period. And if the jury would have been satisfied with that, perhaps Mr. Harvey could have prevailed and then we would be here litigating timing. But unfortunately for Mr. Harvey, Mr. Countryman went into more detail than that in the liability action, probably because the jury wants to have more of a basis for the expert's opinion. And so the fact is that Mr. Countryman was asked both on direct and cross-examination when did the damage occur. I mean, that issue, maybe it didn't need to be addressed in the liability action, but it certainly was addressed in the liability action, and Mr. Countryman was very clear in his testimony in that regard. So under the circumstances of this case, we don't need to go any further than the factual predicate that was established in that liability action. But does his testimony as to when the ultimate harm occurred necessarily negate the inception of harm during the policy period through the cyclic pressure? Your Honor, if I understand what you're asking. Let me try and be clear. We know when the boat sank, but does that necessarily tell us when the harm first commenced in the sense of Montrose? No. If we put aside any of Mr. Countryman's testimony, it doesn't. And that's why Scottsdale defended this case under a reservation of rights, because the bare allegations were insufficient to determine the timing of the property damage and whether it occurred during the policy period or outside of the policy period. I guess I still don't see the inconsistency. My recollection of the State court testimony is that when he was asked to kind of give a narrative, he started in July by saying, well, in July, here's how it all came about. In July, a log got wedged and then these other things happened. It was one course of events beginning in July. And that was his testimony then. I guess I don't see why the amplification of that is an inconsistency. Well, actually, what Mr. Countryman testified to in the trial of the liability action was that in July, a log got wedged in between the barge and the pier. But what he said was that the river stayed constant through July, August, September, and October. And although there may have been cyclic forces that was causing the somewhat a restriction of the dock, that isn't what Mr. Harvey sued Mr. Moreno for. He sued for the sinking of his dock. And he clearly testified that there was really no significant damage done to the dock and that the dock would not have sunk but for the fact that the river dropped in October. And it was at that point that the log actually caused the damage to the barge. And then in November, when the river rose, the barge ultimately sank. Let me try a hypothetical with you. I take my car into a shop to repair the brakes, and the repairman leaves unattached the brake fluid line. I drive home, put my car in the garage, and I leave it for six months because I'm off on a trip or something like that. The brakes worked okay up until the time I put it into my garage. But then when I come back, start the car up, charge the battery, and drive out on the street, I try to use the brakes and I get involved in an accident. And that accident occurred outside my automobile liability policy. And you insure the repair shop. There's no coverage under those circumstances, and that's under the Montrose case, the California Supreme Court decision in Montrose. It doesn't matter when the alleged occurrence, i.e., the negligence of the repair shop took place. And that's because the policy language specifically states that the property damage must happen during the policy period. So there would be no coverage under that circumstance. Suppose the brake shoe was overly tightened, and when it went out the shop, it had an incipient crack in it. Judge Hawkins puts it in his garage, takes it out six months later, drives it up and down some rough roads, and the crack expands, breaks, and he has an accident. Coverage or not? If the hypothetical is that there was a ‑‑ that it started out as a small crack, and over the course of time there was continuous and progressive increasing in that crack, then yes, there would be coverage under those circumstances. So the reason why the first hypothetical is more analogous to our facts than the second is because in this case, although there was some alleged cyclic forces that took place during the policy period,  if we were here about, for example, the facts also establish in this case that there was a rupture to a seam in the barge, which took place during the policy period. And if Mr. Harvey had made a claim to Mr. Moreno for the cost of fixing that seam, there would be coverage for that. But the damage to that seam is not what caused the barge to sink. What if there's metal fatigue that's not visible to the human eye, but nevertheless is weakening the barge? If that was the factual predicate, then if ‑‑ so if it was established that there was continuous and progressive weakening of the barge system, then there would be more of a potential for coverage in the circumstance, but that's not the factual predicate that we have before us. But if there's continual weakening, and instead of weakening coming to its own end and causing the barge to sink, there's some intervening event, rapid sink in the water level, do we ignore the progressive part of the weakness? That's a good point, Your Honor. If you read Mr. Countryman's affidavits carefully, and let's assume that those affidavits are admissible and we use an abusive discretion standard to do that. If you read it, Mr. Countryman is very careful not to say that he never says in his affidavits that these alleged cyclic forces are in any circumstance what caused the barge to sink. He never says that. He says that it may have somewhat contributed to what may have become the ultimate sinking of the barge. It's not quite that vague. He says in paragraph 9, the continuous process of cyclic load and resultant fatigue contributed to the ultimate rupture of the metal hull. That's pretty straight up. But he never says that the rupture of the metal hull ultimately caused the sinking of the docking facility. And isn't that directly contradictory to his testimony at trial when he was asked, was this damage caused by a continuous force or was it a single occurrence? And his testimony was it was a single occurrence. It was when the river dropped in October and thereby the barge dropped, and then when the river rose, the barge couldn't rise with the river, and that's what caused it to sink. It was so clear in his trial testimony the timing of the property damage. And the district court clearly caught on to that, that Mr. Countryman was in trying to backpedal in order to attempt to obtain coverage for his client in the subsequent coverage action. That's where the real sham comes into play. Okay. Thank you for your argument. Thank you very much. Very helpful. Rebuttal? A couple of points in rebuttal. First of all, the testimony by Mr. Countryman in response to questions along the lines that were just discussed were anything but directly responsive to those questions, and I think I'm not going to reread that testimony, but it's highlighted in all the briefs. I think any reading of it would indicate what we've said from the inception of this argument, that that was not the issue that Mr. Countryman was addressing at that time. I also want to point out that at least one of the arguments with respect to the standard of abuse of discretion on this affidavit issue I don't believe applies. I think that we're making a legal argument that the court can take cognizance of, that in this particular situation it's not appropriate to apply the sham evidence rule in the first instance, and I don't believe that an abuse of discretion standard necessarily applies to that legal reasoning. I also want to point out that when counsel indicates that Mr. Countryman talked about a single-point load, he is talking about, and I think it's at least, if it's not perfectly clear, at least another interpretation is appropriate, that what he's talking about is a location on the barge hull, a single location, where loading occurs. He does not address the idea of whether or not it's cyclic prior to that, because it's not germane to his original testimony in the state court action. He clarifies that in the affidavit, that there was preexisting cyclic loading. He also, appellee argues, that the river situation was static. There's ample testimony that, in matter of fact, that was adopted by counsel representing Mr. Moreno in some of the questioning, that there was at least a one-foot fluctuation on an ongoing basis during the policy period while the log was wedged. And the fact that there were forces being applied to the metal was obvious from testimony from Mr. Harvey to the effect that they took a chain and attempted to get the log free by pulling a 50-ton chain on the opposite side of the barge, which broke. And, again, I don't think anything has been addressed as far as the appellee is concerned with respect to the testimony from Mr. Harvey, that, in fact, the dock connection, the rings and the log, restricted movement. That testimony exists aside from anything that Mr. Countryman said. And Mr. Countryman was completely consistent about the mechanism of failure here, that once the river dropped dramatically, in this particular case, not that the same mechanism didn't exist before, but when it ruptured, river drops dramatically, the log does not permit the rings to go down with the river level, the weight of the barge then comes into direct contact with the log, and in that particular instance with enough force to actually rupture the metal, the metal hole at that point. That does not preclude processes. Metal fatigue, I think the example Your Honor gave with respect to the brakes, is perfectly appropriate to this situation. Clearly there was a mechanism. If you accept that testimony, river fluctuations, the fact that the log was applying this load to it, there's nothing inconsistent about the idea that there was metal fatigue that contributed to this ultimate failure. Okay. Thank you for your argument. Thank both sides for their argument. The case just argued will be submitted for decision, and the Court will stand adjourned. All rise. This Court for this session stands adjourned. The Court is adjourned.
judges: Selna Hawkins, Graber